UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


SMITH                                        CIVIL ACTION

VERSUS                                       NO: 12-3059

REGIONAL TRANSIT AUTHORITY,                  SECTION: "J" (4)
ET AL.


**ORDER AND REASONS**

Before the Court are Defendants' **Motion to Dismiss (Rec. Doc. 12)**, Plaintiffs' opposition thereto **(Rec. Doc. 13)**, and Defendants' reply to same **(Rec. Doc. 18)**. Also before the Court are the parties' supplemental briefs and exhibits **(Rec. Docs. 20, 21)**. Defendants' motion was set for hearing on May 9, 2013, with oral argument. The Court, having considered the motion, memoranda, and arguments of counsel, the record, and the applicable law, finds that Defendants' motion should be **GRANTED** for the reasons set forth more fully below.

**PROCEDURAL HISTORY AND BACKGROUND FACTS**

This action arises out of claims brought under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §

1

1001 *et seq.*, and the Louisiana Direct Action Statute, La. Rev. Stat. § 22:655. Plaintiffs in this action are former employees of New Orleans Public Service, Inc. ("NOPSI") and retirees of Transit Management of Southeast Louisiana, Inc. ("TMSEL"). On December 31, 2012, Plaintiffs filed suit against Defendants, the Regional Transit Authority ("RTA") and TMSEL, alleging violations of ERISA and related state law. Plaintiffs assert that Defendants denied them benefits owed to them under their employee welfare benefits plan. Specifically, Plaintiffs allege that Defendants have denied them premium free medical insurance, quarterly Medicare premiums, and deductible reimbursements as guaranteed by their plan. Plaintiffs assert that Defendants have also breached their fiduciary duties under ERISA.

Plaintiffs' Complaint and the parties' supplemental briefs set out the following relevant facts. Prior to 1983, the New Orleans transit system was run by a privately-held company, NOPSI. In the late 1970's and early 1980's, the system transitioned into a publically-held system owned by RTA and operated and managed by TMSEL.[1] The NOPSI employees became

---

[1] In 1983, RTA contracted with ATE Management and Service Company, Inc. ("ATE"), a transit management firm, to operate the transit system. The contract between the entities provided that ATE would form a wholly-owned subsidiary, TMSEL, which would be assigned the contract to operate the transit system. Pls.' Ex. A to Suppl. Brief, Rec. Doc. 21-1, p. 5.

employees of TMSEL.[2] At the time of the purchase, pursuant to the Urban Mass Transportation Act of 1964, NOPSI, the transit union, and the City of New Orleans had a preexisting agreement ("13(c) Agreement") which provided, among other things, "fair and equitable arrangements" for NOPSI employee benefits.[3] On March 17, 1983, RTA and TMSEL, as successors in interest to NOPSI, agreed to assume the "rights, duties, and responsibilities" contained in the 13(c) Agreement.[4] Section 2 of the agreement required that RTA and TMSEL preserve and continue the rights and benefits of the NOPSI employees.[5]

On June 28, 1983, RTA completed the purchase of the transit system from NOPSI with funding from federal grants.[6] Likewise, on that same date, RTA, TMSEL, and NOPSI entered into an additional agreement, "The Employee and Retiree Pension and Welfare Benefit Agreement" ("Benefit Agreement"), which specifically recognized RTA and TMSEL's benefit obligations. The Benefit Agreement provided that each employee transferred from NOPSI to "RTA or

---

[2] Pls.' Ex. 1-B to Compl., Rec. Doc. 1-3, p. 1 ("[A]ll members of Local 1560 who are employees of NOPSI will be transferred to employment with [TMSEL].").

[3] Pls.' Ex. 1-A to Compl., Rec. Doc. 1-2, p. 1.

[4] Compl., Rec. Doc. 1, p. 7 ¶ 6.

[5] Pls.' Ex. 1-A to Compl., Rec. Doc. 1-2, p. 1.

[6] Compl., Rec. Doc. 1, p. 6 ¶ 5.

TMSEL" would continue to receive the same coverage and benefit levels that they had received under NOPSI.[7] It stated that "RTA and TMSEL shall be fully responsible, and make any payments due, for any benefits" of the former NOPSI employees.[8] In addition, the Benefit Agreement also set up a funding structure in order to ensure that the pension benefits could be maintained. NOPSI agreed to transfer a single sum of $7,330,000 to RTA contemporaneous with RTA's payment of the $21,000,000 purchase price for NOPSI's transit properties. NOPSI also agreed to reimburse RTA or TMSEL for future insurance premiums and benefit payments for retirees until the reimbursement equaled $13,000,000 plus a 9% upward adjustment factor per annum. The reimbursements were to be deposited in a separate "Reimbursement Account." Likewise, the Benefit Agreement also required that the City of New Orleans establish a bookkeeping account equal to $11,000,000. RTA and/or  TMSEL was given the right to adjust the retirees coverage after the Reimbursement Account was exhausted. At the time that this agreement was reached, RTA was considered to be a public entity—a political subdivision of the state, and TMSEL was

---

[7] Pls.' Ex. 1-D to Compl., Rec. Doc. 1-4, pp. 2-3.

[8] Pls.' Ex. 1-D to Compl., Rec. Doc. 1-4, p. 3.

a privately owned corporation.[9] In 2004, the Louisiana State Legislature designated TMSEL as a political subdivision for litigation purposes. La. Rev. Stat. § 13:5102. In 2009, TMSEL ceased operations and stopped providing services to RTA.[10] In January 2012, RTA became 100% owner of TMSEL.[11]

Plaintiffs allege that from 1983 until March 2006, RTA administered the employee benefit plan as it had been administered by NOPSI—by providing premium-free medical insurance, life insurance, quarterly supplemental Medicare payments, and Medicare premium reimbursements. However, Plaintiffs contend that in the wake of Hurricane Katrina, RTA and/or TMSEL began charging medical insurance premiums to retirees and stopped providing quarterly Medicare premiums and deductible reimbursements. Plaintiffs assert that while such

---

[9] RTA was created by statute on August 1, 1979 and is defined as "a body politic and corporate and political subdivision of the state of Louisiana." La. Rev. Stat. § 48:1654(A). As has been noted, TMSEL was created by virtue of a private agreement between RTA and ATE. Pls.' Ex. A to Suppl. Brief, Rec. Doc.21-1, p. 5.

[10] Pls.' Ex. J to Opp., Rec. Doc. 13-10, p. 2. Based on the documentation provided by the parties it appears that  between 2009 and 2012 the public transportation system was operated by either Interregional Transit, Inc. or Veolia Transportation Services, Inc. See Pls.' Ex. 1 to Suppl. Brief, Rec. Doc. 21-1, p. 5 (2005 Cooperative Endeavor Agreement between RTA and Interregional Transit, Inc.); Pls.' Ex. J to Opp. Rec. Doc. 13-10 (2012 Dissolution Agreement between RTA and Interregional); Pls.' Ex. 5 to Suppl. Brief, Rec. Doc. 21-5 (2008 Transit Management Agreement between RTA and Veolia Transportation Services, Inc.).

[11] Pls.' Ex. J to Opp., Rec. Doc. 13-10, p. 3.

changes were initially deemed to be temporary, they have continued until the present time. Plaintiffs contend that the changes are in violation of ERISA, and that they are owed the same welfare benefits that they received from NOPSI. Plaintiffs also allege that RTA and/or TMSEL breached their fiduciary duties to Plaintiffs under ERISA.

Defendants filed the instant Motion to Dismiss on February 20, 2013. Plaintiffs responded in opposition on March 5, 2013. Defendants replied on March 13, 2013. Upon review of the parties' memoranda, the Court issued an order requesting additional briefing and documents.  The parties complied with the Court's order on April 26, 2013.

## THE PARTIES' ARGUMENTS

Defendants argue that Plaintiffs' Complaint must be dismissed under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction or, alternatively, under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. Specifically, under Rule 12(b)(1), Defendants contend that the benefit plan in question is a "governmental plan" and, therefore, is excepted from the ERISA framework. Defendants report that this Court's only basis for subject matter jurisdiction is ERISA. Thus, Defendants assert that if the

benefit plan does not fall under ERISA's framework, this Court lacks any basis on which it can hear this case.

In furtherance of their argument, Defendants make the following contentions. Defendants argue that the status of a plan as governmental is determined at the time that the suit is filed, not the time that the benefit plan was established. Defendants contend that when the suit is filed, courts look at the current status of the entity sponsoring or maintaining the plan. They aver that if the entity sponsoring or maintaining the benefit plan is deemed to be a governmental entity under ERISA, then the court finds that the plan is exempt from the statute.

Defendants report that a "governmental entity" is "any State or political subdivision thereof, or [] any agency or instrumentality of any of the foregoing."[12] In the instant case, Defendants assert that both RTA and TMSEL are currently political subdivisions of the state and, therefore, governmental entities. In support, Defendants point to the definition of political subdivision developed in National Labor Relations Board v. Natural Gas Utility District of Hawkins County, Tennessee, 402 U.S. 600 (1971). Defendants argue that in Hawkins, the United

---

[12] Defs.' Mem. in Supp., Rec. Doc. 12-1, p. 6 (quoting 29 U.S.C. § 1002(32)).

States Supreme Court held that "an entity is a political subdivision if it is either (i) created by the State so as to constitute a department or administrative arm of the government, or (ii) administered by individuals who are responsible to public officials or the general electorate."[13] Defendants assert that in this case, both RTA and TMSEL are currently designated as political subdivisions by state statute. Moreover, they contend that the members of RTA are appointed by public officials. Lastly, they report that in 2009, TMSEL ceased operations and no longer provided services to RTA, and in January 2012, RTA became 100% owner of TMSEL. Therefore, Defendants assert that these facts eliminate any argument that the plan is currently administered by a private corporation, i.e. TMSEL. As such, they contend that this is a governmental plan under ERISA.

In the alternative, Defendants also argue that Plaintiffs' claims should be dismissed under Rule 12(b)(6) because they have failed to exhaust their administrative remedies. Specifically, Defendants contend that Plaintiffs have not alleged that they filed an administrative claim for benefits before filing suit and/or that their failure to do so was excused on the basis of futility. Thus, Defendants assert that Plaintiffs' claims should

---

[13] Defs.' Mem. in Supp., Rec. Doc. 12-1, p. 6.

be dismissed.

In response, Plaintiffs argue that this Court has subject matter jurisdiction because the plan does not fall into the ERISA governmental plan exception. First, Plaintiffs contend that Defendants are misrepresenting the welfare benefits plan to the Court. Plaintiffs allege that in other cases, these same Defendants have actually argued that this plan *is* an ERISA plan. As such, Plaintiffs aver that the Court should not rely on Defendants current assertions because they are "baseless and opportunistic."[14] Second, Plaintiffs contend that this plan is not a governmental plan because the welfare benefit plan was commenced with private funds and its status has not changed since it was established. Specifically, Plaintiffs assert that the benefit plan was originally funded with NOPSI's private funds, then it was managed by TMSEL, a private corporation.[15] Plaintiffs argue that despite the statute that Defendants reference, TMSEL is still listed as a corporation with the Louisiana Secretary of State, thereby indicating that it is a private rather than a public entity. Furthermore, Plaintiffs assert that the January

---

[14] Pls.' Opp., Rec. Doc. 13, p. 15.

[15] Plaintiffs assert that it is of no consequence that RTA owned the transportation system. They contend that it is only relevant that TMSEL managed the system, the workers, and the benefit plan.

2012 Dissolution Agreement between RTA and Interregional Transit,
Inc., by which RTA acquired 100% of TMSEL's stock, has no impact
on the status of the benefit plan. Plaintiffs note that the
dissolution agreement provides that "TMSEL [will] remain the
employer . . . and [will] retain responsibility for the payment
and performance of all outstanding obligations . . . including,
[] wages, benefits, pension or profit sharing plans, and labor
contracts."[16] Thus, Plaintiffs contend that RTA and TMSEL are
jointly responsible for the benefit plan and they argue that, in
the Fifth Circuit, "'when a pension plan has been established by
a [private] entity for its employees and the [private] entity's
status as employer has not changed, the plan must be [an] ERISA .
. . plan."[17]

    Furthermore, Plaintiffs also assert that the benefit plan is
not a governmental plan because there are extensive private
interests involved in the plan's funding and operation. In
particular, Plaintiffs contend that courts generally apply a six
factor test derived from the Internal Revenue Code to determine
whether the predominate interests in the plan are public or
private. Where the interests are private, Plaintiffs argue that

---

[16] Pls.' Ex. J, Rec. Doc. 13-10, p. 3.

[17] Pls.' Opp., Rec. Doc. 13, p. 19 (citing <u>Hightower v. Tex. Hosp. Ass'n,</u>
65 F.3d 443, 448 (5th Cir. 1995)).

courts find that the plan is not a governmental plan. Plaintiffs assert that in the instant case, the benefit plan was created by a private entity and is managed in whole or in part by a private entity. Likewise, Plaintiffs note that the original Benefit Agreement provided for a large influx of private money from NOPSI to maintain the employees' benefits. Thus, Plaintiffs assert that the plan is a private plan governed by ERISA.

In support of these arguments, Plaintiffs note that the plan was created for the benefit of hundreds of private employees. Plaintiffs assert that the United States Department of Labor has concluded that if a benefit plan covers more than a de minimus number of private sector employees, then the plan may not be considered a governmental plan. In conjunction, Plaintiffs also point to the fact that the Pension Benefit Guaranty Corporation ("PBGC"), the governmental agency designated to oversee direct benefit pension plans under Title IV of ERISA, designates the TMSEL Pension Plan as an ERISA plan on its Web site. Plaintiffs argue that this designation supports their argument that the benefit plan is not a governmental plan, but rather, an ERISA plan.

Lastly, Plaintiffs contend that to the extent that Defendants have argued that the benefit plan is currently being

maintained with public funds, Defendants cannot rely on their own mismanagement of funds for support. Specifically, Plaintiffs argue that the benefit plan was intended to be privately funded; however, through mismanagement, both RTA and TMSEL contributed to the diminishing of the private assets that maintained the plan. Therefore, Plaintiffs assert that Defendants cannot rely on their own breach of fiduciary obligations to support their position that the benefit plan is exempt from ERISA.

With respect to Defendants arguments under Rule 12(b)(6), Plaintiffs assert that they are not required to exhaust their administrative remedies because they have alleged a statutory violation of ERISA rather than a mere denial of benefits. Likewise, Plaintiffs argue that they are not required to exhaust their administrative remedies because (1) such actions would be futile; (2) Plaintiffs were threatened with irreparable harm; and (3) Plaintiffs were denied meaningful access to the plan's administrative procedures. Specifically, Plaintiffs assert that in February 2012, a Plaintiff in this suit met with the President of TMSEL and legal counsel for RTA in order to discuss his welfare benefits. In the meeting, RTA and TMSEL representatives allegedly told the Plaintiff that they were unwilling to reinstate the welfare benefits that he sought (specifically, the

benefits discussed in this suit). Furthermore, they also allegedly told the retiree that the funding provided by NOPSI was exhausted and that if he attempted to initiate litigation, then the representatives would recommend to RTA that all of the retirees pay 100% of the cost of their medical insurance premiums. Plaintiffs assert that such threatening statements demonstrate that exhausting administrative remedies in this matter would have been futile. Lastly, Plaintiffs contend that they were never provided with any plan documents outlining possible administrative procedures that they could take. Thus, they assert that they are not required to exhaust them.

In reply, Defendants argue that Plaintiffs have misinterpreted and misstated the pertinent ERISA case law. Furthermore, they allege that Plaintiffs have refused to acknowledge the facts set out in their own complaint—that RTA and TMSEL are political subdivisions of Louisiana. First, Defendants reassert that subject matter jurisdiction is determined as of the time that the complaint is filed. Therefore, they contend that because RTA is currently the 100% owner of TMSEL and the sole fiduciary of the benefit plan, that this is a governmental plan exempt from ERISA.

Second, Defendants argue that Plaintiffs have not given

effect to the differences between the governmental exemptions in Title I and Title IV of ERISA. Specifically, Defendants note that this is demonstrated by Plaintiffs' reference to the PBGC. Defendants contend that the PBGC was created under Title IV of ERISA and only has oversight over defined benefit pension plans. Defendants assert that Title IV, as a result, is limited to the governance of defined benefit plans and does not extend to welfare benefit plans such as the plan at issue in this case. Thus, Defendants argue that the PBCG's classification of the TMSEL *Pension* Plan as an ERISA plan is of no consequence to the current action, which concerns a *welfare benefit plan* that is governed by Title I of ERISA. Likewise, Defendants note that Fifth Circuit case law has demonstrated that a plan may be considered a governmental plan under one title and not the other. As such, Defendants contend that a finding that the welfare benefit plan in question is a governmental plan and not an ERISA plan will not conflict with the PBCG's determination that the pension plan is an ERISA plan.

Third, Defendants assert that Plaintiffs have failed to demonstrate any legal or factual basis to rebut TMSEL's status as a political subdivision. Defendants argue that Plaintiffs have not put forth any proof that disputes that TMSEL is wholly owned

and operated by RTA. In fact, Defendants contend that Plaintiffs'
own allegations that TMSEL is "under the complete direction and
control of RTA," and Plaintiffs service of a public records
request on RTA support Defendants' assertions that the welfare
benefit plan is a governmental plan.[18] Likewise, Defendants argue
that TMSEL's secretary of state filing cannot trump an act of
the legislature which states that TMSEL is a political
subdivision. Furthermore, Defendants assert that corporations
that provide traditional governmental functions can still be
political subdivisions, and that their status as a corporation
does not necessarily conflict with their status as a public
agency.

Lastly, Defendants argue that Plaintiffs have failed to
establish that exhaustion would have been futile because they
have not made a "clear showing that the plan administrators
harbor bitterness and hostility for the claimant."[19]

In addition to the motion and memoranda discussed above, the
Court also requested additional briefing on whether TMSEL may be
considered an agency or instrumentality of Louisiana and/or RTA

---

[18] Defs.' Reply, Rec. Doc. 18, p. 6 (citing Compl., Rec. Doc. 1, pp. 9-10
¶¶ 12-13.

[19] Defs.' Reply, Rec. Doc. 18, p. 9 (quoting Denton v. First Nat'l Bank,
765 F.2d 1295, 1303 (5th Cir. 1985)).

as well as the nature, formation, and funding of TMSEL. The
parties responded to the Court's order by providing the Court
with two separate tests for determining whether TMSEL is an
agency or instrumentality. Defendants argue that if the Court
does not find that TMSEL is a political subdivision, then it
should find that TMSEL is an agency or instrumentality of RTA
under the test that they have proposed. Plaintiffs assert that
TMSEL is not an agency or instrumentality of RTA under their
proposed test and/or Defendants' test. The parties' proposed
tests are discussed herein.

### DISCUSSION

As a preliminary matter, the Court notes that "the
opportunity to challenge subject matter jurisdiction can never be
waived by a party's actions or representations;" therefore, this
Court finds that the prior actions, pleadings, and filings of
Defendants in this case are of no consequence to the question of
subject matter jurisdiction that is currently before the Court.
Krupp v. Lincoln Univ., 663 F. Supp. 289, 290 (E.D. Pa. 1987)
(citing Ins. Corp. of Ireland, Ltd. v. Compagnie Des Baucites de
Guinee, 456 U.S. 694, 702 (1982)). As such, the Court will
proceed to analyze subject matter jurisdiction based on
Defendants' current allegation: that the welfare benefit plan in

question is a governmental plan exempt from ERISA.

**A. Legal Standard**

In deciding a motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), "the district court is 'free to weigh the evidence and resolve factual disputes in order to satisfy itself that it has the power to hear the case.'" Krim v. pcOrder.com, Inc., 402 F.3d 489, 494 (5th Cir. 2005). The party asserting jurisdiction must carry the burden of proof for a Rule 12(b)(1) motion to dismiss. Randall D. Wolcott, M.D., P.A. v. Sebelius, 635 F.3d 757, 762 (5th Cir. 2011). Lack of subject matter jurisdiction may be found (1) on the complaint alone; (2) on the complaint supplemented by facts evidenced in the record; and (3) on the complaint supplemented by the court's resolution of disputed facts. Ramming v. U.S., 281 F.3d 158, 161 (5th Cir. 2001). The standard of review for a facial challenge to a motion to dismiss under Rule 12(b)(1) is the same as that for a motion to dismiss pursuant to Rule 12(b)(6). United States v. City of New Orleans, No. 02-3618, 2003 WL 22208578, at *1 (E.D. La. Sept. 19, 2003); see also,13 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 3522 (3d ed. 2008).

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff

17

must plead enough facts to "state a claim to relief that is plausible on its face." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 547 (2007)).  A claim is facially plausible when the plaintiff pleads facts that allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u>  A court must accept all well-pleaded facts as true and must draw all reasonable inferences in favor of the plaintiff. <u>Lormand v. U.S. Unwired, Inc.</u>, 565 F.3d 228, 232-33 (5th Cir. 2009); <u>Baker v. Putnal</u>, 75 F.3d 190, 196 (5th Cir. 1996).  The court is not, however, bound to accept as true legal conclusions couched as factual allegations. <u>Iqbal</u>, 556 U.S. at 678.

**B.  Applicable Law**

ERISA was enacted by Congress to provide comprehensive regulation of employee benefit plans. <u>Aetna Health,Inc. v. Davila</u>, 542 U.S. 200, 208 (2004). Under ERISA, an employee benefit plan is defined as "any plan, fund, or program . . . established or maintained by an employer . . . for the purpose of providing for its participants or their beneficiaries . . . benefits in the event of sickness, accident, disability, death, or unemployment . . . . 29 U.S.C. § 1002(1). While ERISA was designed to be comprehensive, Congress did make certain

18

exceptions to its scope. Specifically, Congress determined that "governmental plans" should be excluded from the ERISA framework. See 29 U.S.C. § 1003. Title I of ERISA defines a governmental plan as, "a plan established or maintained for its employees by the Government of the United States, by the government of any State or political subdivision thereof, or by any agency or instrumentality of any of the foregoing." 29 U.S.C.§ 1002(32). The United States Circuit Court of Appeals for the Fifth Circuit has explained that the definition of governmental plan under Title I is disjunctive and, therefore, a plan may be considered to be a governmental plan where a party can prove that it was either (1) established by an entity falling within the confines of the aforementioned definition, or (2) that it is currently maintained by such an  entity. Hightower, 65 F.3d at 450. Thus, the question before this Court is whether RTA and/or TMSEL constitute political subdivisions, agencies, or instrumentalities of the United States, Louisiana, or  any political subdivision of either. Defendants have not argued that the benefit plan was established by a governmental entity, but rather, only argue that the benefit plan is maintained by a governmental entity. Therefore, the Court will assume for the purposes of this motion that the benefit plan was established by a private entity and, as

19

such, at its inception was an ERISA plan. Thus, the only remaining question, and the one that is dispositive, is whether the benefit plan is currently maintained by a political subdivision, agency, or instrumentality of the United States, Louisiana, or a political subdivision of either.

### 1. Political Subdivision

ERISA does not define the term political subdivision. See Koval v. Wash. Cnty. Redevelopment Auth., 574 F.3d 238, 240 (3rd Cir. 2009) (noting that the ERISA statute does not define political subdivision). Likewise, it appears that the Fifth Circuit has not directly addressed whether an entity is a political subdivision for the purposes of ERISA. The parties have proposed two different tests.

Defendants assert that the proper test for determining whether an entity is a political subdivision is the test developed in National Labor Relations Board v. Natural Gas Utility District of Hawkins County, Tennessee. In Hawkins, the Supreme Court considered whether a utility district fell within the political subdivision exception to its jurisdiction under the National Labor Relations Act ("the NLRB Act"). 402 U.S. at 601. Like ERISA, the NLRB Act did not define the term "political subdivision," nor did the legislative history indicate that

20

Congress had considered its meaning. Id. at 604. Therefore, the Court adopted the criteria typically applied by the National Labor Relations Board ("NLRB") in agency determinations. Specifically, the Court found that the proper test considered whether the utility district was "(1) created directly by the state, so as to constitute [a] department[] or administrative arm[] of the government, or (2) administered by individuals who [were] responsible to public officials or the general electorate." Id. at 604-05.   The Second, Third, and Seventh Circuits have all applied this test to ERISA.[20]

For example, in Rose v. Long Island R.R. Pension Plan, 828 F.2d 910 (2nd Cir. 1987), the court determined the Metropolitan Transit Authority was a political subdivision under the NLRB test. Id. at 916. The court explained that "[t]he NLRB guidelines are a useful aid in interpreting ERISA's governmental exemption, because ERISA, like the National Labor Relations Act, 'represents an effort to strike an appropriate balance between the interests of employers and labor organizations.'" Id. (quoting H.R. Rep. No. 522, 1974 U.S. Code Cong. & Ad. News at 4647). Likewise, both

---

[20] One district court within the Fifth Circuit has also applied this test to ERISA. See Scott v. Unum Life Ins. Co. of Am., No. 09-0922, 2010 WL 114404, at *5 (W.D. La. Jan. 11, 2010). Likewise, although it has not applied this test to ERISA, the Fifth Circuit has applied this test in the context of an Occupational Safety and Health Act case. See Startran, Inc. v. Occupational Safety and Health Review Comm'n, 608 F.3d 312, 320-25 (5th Cir. 2010).

the Third and Seventh Circuits have explained that ERISA's broad concerns with balancing federalism and labor relations parallel the concerns raised by the NLRB Act and, therefore, make the NLRB test the appropriate test for determining whether an entity is a political subdivision under ERISA as well. <u>Koval</u>, 574 F.3d 238, 241-43 (3d Cir. 2009); <u>Shannon v. Shannon</u>, 965 F.2d 542, 547-48 (7th Cir. 1992). Thus, Defendants urge the Court to adopt this disjunctive test.

Plaintiffs rely on <u>Pridgen v. Texas Mutual Insurance Co.</u>, No. 04-189, 2004 WL 2070956 (N.D. Tex. Sept. 15, 2004), for their proposed test.[21] Specifically, Plaintiffs cite to the <u>Pridgen</u> court's recitation of the factors outlined in the Internal Revenue Code, Revenue Ruling 57-128, which, Plaintiffs' argue, is the definitive test for determining whether an entity falls into the governmental plan definition:

---

[21] The Court notes that the Plaintiffs generally state that the test in <u>Pridgen</u> is the proper test to use to determine whether a plan is a governmental plan. Plaintiffs do not specifically argue that it is the proper test to determine whether an entity is a political subdivision. However, because the entirety of Defendants' memo argues that this issue will be decided by determining that RTA and/or TMSEL is a political subdivision, because this is the counter test that Plaintiffs propose to the NLRB test, and because <u>Pridgen</u> cites this test after noting that the terms political subdivision, agency, and instrumentality are not defined under ERISA, the Court will construe this as Plaintiffs' proposed counter test for determining whether an entity is a political subdivision.

22

(1) whether [the organization] is used for a governmental purpose and performs a governmental function;

(2) whether performance of its function is on behalf of one or more states or political subdivision;

(3) whether there are any private interests involved, or whether the states or political subdivisions involved have the powers and interests of an owner;

(4) whether control and supervision of the organization is vested in public authority or authorities;

(5) if express or implied statutory or other authority is necessary for the creation and/or use of such an instrumentality, and whether such authority exists; and

(6) the degree of financial autonomy and the source of its operating expenses.

Id. at *3 (quoting Rev. Rul. 57-128).

While the Pridgen court did note that two other courts had used these factors, this Court does not find Plaintiffs' reliance on Pridgen or use of Revenue Ruling 57-128 persuasive for the purposes of determining whether an entity is a political

23

subdivision.[22] First, although the <u>Pridgen</u> court cited to Revenue
Ruling 57-128, it did not apply that test to the case before it.
Rather, the court applied separate factors outlined in Revenue
Ruling 89-49 and determined that the plan in question was not a
governmental plan.[23] Thus, where the actual case that Plaintiffs
have cited did not rely on the test that Plaintiffs propose, this
Court finds no reason to rely on it either. Second, while the
<u>Pridgen</u> court does specifically reference cases applying Revenue
Ruling 57-128, the courts in those cases did not actually
consider the question of whether the entity establishing or
maintaining the plan was considered to be a "political
subdivision" under the ruling. Instead, in both of the cases
cited in <u>Pridgen</u>, the courts applied Revenue Ruling 57-128 to
determine whether the entities in question were considered to be
"agencies" or "instrumentalities" of the state or of a political
subdivision of the state. <u>See Rose</u>, 828 F.2d at 917-18; <u>Dickerson
v. Alexander Hamilton Life Ins. Co. of Am.</u>, 130 F. Supp. 2d 1271,

---

[22] While the Court does not agree that this test should be applied when
determining whether an entity is a political subdivision, it does find that case
law supports its application to the question of whether or not an entity is an
agency or instrumentality. <u>See Rose</u>, 828 F. 2d at 917-18; <u>Dickerson</u>, 130 F. Supp.
2d at 1274; <u>see also</u> Rev. Rule 57-128 (holding that based on the aforementioned
six factors the entity in question was an instrumentality).

[23] <u>Pridgen</u>, 2004 WL 2070956 at *4 – 6. Notably, the test that the <u>Pridgen</u>
court did apply did not focus on whether the entities administering the plan were
political subdivisions, agencies, or instrumentalities. <u>Id.</u> Instead, it generally
focused on the question of was the plan a "governmental plan." <u>Id.</u>

1274 (N.D. Ala. 2001). Third, in <u>Rose</u>, one of the cases cited in <u>Pridgen</u>, the court actually applied the aforementioned *NLRB test* to determine whether a the entity in question qualified as a political subdivision. 828 F.2d at 918. It only applied the revenue ruling test to determine whether a separate entity was considered to be an agency or instrumentality. <u>Id.</u> As such, the Court does not find any support for actually applying Revenue Ruling 57-128 to the interpretation of whether an entity qualifies as a political subdivision. Nor does it find that Plaintiffs' arguments under this rule are sufficient to overcome Defendants' arguments on this point. Accordingly, the Court finds that the NLRB test is the appropriate test for determining whether an entity is a political subdivision and will proceed with that analysis.

Under the NLRB test, a political subdivision is an entity that is "(1) created directly by the state, so as to constitute [a] department[] or administrative arm[] of the government, or (2) administered by individuals who [were] responsible to public officials or the general electorate." <u>Hawkins</u>, 402 U.S. at 604-05. Under this test, it is clear that RTA is a political subdivision of Louisiana. RTA, "a body politic and a corporate and political subdivision of the state," was created on August 1,

1979 by public act. La. Rev. Stat. § 48:1654. RTA's purpose is "to plan, design, lease as lessee, purchase, acquire, hold, own, construct, improve, have an equity in, finance, maintain, and administer a transit system within the metropolitan area." Id. These purposes are for the benefit of the people of Jefferson, Orleans, St. Bernard, and St. Tammany parishes (the geographical area in which RTA was created). Thus, RTA meets the first prong of the NLRB test because  it was "created directly by the state, so as to constitute [a] department[] or administrative arm[] of the government." See Hawkins,  402 U.S. at 604-05.

Likewise, RTA meets the second prong of the NLRB test. RTA is administered by a board consisting of "three members from each participating parish, [who are] appointed by the chief executive officer of that parish, subject to the approval of its governing authority" as well as two additional members who are appointed "by the chief executive officer for the parish with the greatest percentage of public transit revenue." La. Rev. Stat. § 48:1655. These members are recommended by the legislative delegation of each parish. Id. All members "serve at the pleasure of the appointing authority." Id. Thus,  RTA is "administered by individuals who are responsible to public officials or the general electorate." See Hawkins,  402 U.S. at 604-05. As such,

26

this Court finds that RTA is a political subdivision under ERISA.

Defendants also argue that TMSEL qualifies as a political subdivision under the NLRB test. Because the Court finds that TMSEL more precisely fits the description of an agency or instrumentality under ERISA, it declines to analyze TMSEL's status as a political subdivision and makes no findings on that point.

### 2. Agency and/or Instrumentality

ERISA does not define the terms agency or instrumentality. See Rose, 828 F.2d at 917 (noting that the ERISA statute does not define the terms agency and instrumentality). Again, the parties have proposed two different tests for determining whether an entity is an agency or instrumentality.

Defendants argue that the appropriate test for determining whether an entity is an agency or instrumentality is the six factor test provided in Revenue Ruling 57-128 that has been adopted by the Second Circuit. See Rose, 828 F. 2d at 917-18. In contrast, Plaintiffs assert that the proper test is the Alley test, which is a three factor test that has been employed by the D.C. Circuit. See Alley v. Resolution Trust Corp., 984 F.2d 1201, 1206 (D.C. Cir. 1993). Specifically, Plaintiffs argue that this three factor test is appropriate because it emphasizes the

27

employment relationship between the entity in question and its employees.[24] Plaintiffs assert that the leading Fifth Circuit case addressing governmental plans under ERISA, <u>Hightower</u>, focuses on the importance of the employment relationship in making determinations as to whether a plan is an ERISA plan.[25] Therefore, Plaintiffs contend that this test best comports with Fifth Circuit case law.

While the Court does not disagree with Plaintiffs' characterization of the <u>Hightower</u> court's focus on the employment relationship, it does not find that Fifth Circuit precedent requires that the Court apply the <u>Alley</u> test. Rather, the Court finds that in the instant case, the Revenue Ruling test is more appropriate. In particular, the Court notes that in applying the <u>Alley</u> test, the court in that case specifically explained that "a [Revenue Ruling] test focusing broadly on the extent of governmental contacts may be more appropriate [than the <u>Alley</u>

_____

[24] The <u>Alley</u> test, as Plaintiffs characterize it, evaluates the following three characteristics: (1) if the employee is excluded from the state civil service system; (2) if the employee is subject/not subject to governmental personnel rules and salary restrictions; and (3) if the employee is allowed/not allowed to participate in civil servant pension and welfare plans. See <u>Alley</u>, 984 F.2d at 1206-07.

[25] Plaintiffs cite <u>Hightower v. Texas Hospital Association</u> as the leading case on this issue. In particular, Plaintiffs argument refers to the fact that when determining whether or not a plan's status had changed under Title IV of ERISA, the court emphasized that the "'governmental entity's status as employer'" was important. 65 F.3d at 448 (quoting <u>Roy v. Teachers Ins. and Annuity Ass'n</u>, 878 F.2d 47, 50 (2d Cir. 1989)).

test] where state-affiliated entities are concerned." <u>Alley</u>, 984 F.2d at 1205-06 n.11. The court pointed out that in the case before it, it was only evaluating whether an entity was an agency or instrumentality of the federal government, not of a state government or state political subdivision. <u>Id.</u> As such, the <u>Alley</u> court did not have to address the federalism concerns that are prevalent throughout ERISA's legislative history and, consequently, are also the primary reason that the governmental plan exception was created. <u>See</u> <u>Hightower</u>, 65 F.3d at 448 (discussing ERISA's legislative history and noting that "Congress was reluctant to interfere with the administration of public retirement plans due to the resulting federalism implications"); <u>Rose</u>, 828 F.2d at 914 (discussing the federalism concerns underlying the governmental plan provision). In the instant case, such federalism concerns *are* present and, therefore, require that the Court look more broadly at the relationship between TMSEL and the state, not just the relationship between TMSEL and its employees. <u>See</u> <u>Koval</u>, 238 F.3d at 241-42 (finding that the <u>Alley</u> test should not apply where federalism concerns are implicated). Thus, the Court finds that the six factor test provided in Revenue Ruling 57-128 is the appropriate test for determining whether TMSEL is an agency or instrumentality.

Under the six factor Revenue Ruling test, TMSEL is either an agency or instrumentality of RTA. First, TMSEL was created specifically to manage and operate the public transportation system in Jefferson, Orleans, St. Bernard, and St. Tammany parishes.[26] As the Court noted in its analysis of RTA, the transportation system is for the benefit of the public in those parishes and, as such, TMSEL is arguably performing a governmental purpose and function. Second, TMSEL performs this function specifically on behalf of RTA, a political subdivision of the state. Third, although there are private interests involved in the plan since TMSEL is a private corporation and NOPSI, TMSEL's predecessor, was also a private corporation, TMSEL is currently 100% owned by RTA, a political subdivision of the state. Thus, a political subdivision currently has the "powers and interest of an owner." Fourth, while it is true that TMSEL is governed by an independent Board of Directors, the current president, secretary, vice-president, and treasurer of TMSEL are all also employees and/or representatives of RTA.[27]  Likewise, throughout its existence TMSEL has operated with a high degree of

---

[26] See Pls.' Ex. A to Suppl. Brief, Rec. Doc.21-1, p. 5 (explaining that TMSEL was created specifically to run the transit system).

[27] See Defs.' Ex. B to Suppl. Brief, Rec. Doc. 20-1, pp. 2-3; Defs.' Ex. 4 to Suppl. Brief, Rec. Doc. 20-4, pp. 2-3.

oversight and control by RTA.[28] Therefore, it follows that supervision of the organization is vested in public authorities. Lastly, TMSEL's operating expenses and the TMSEL pension plan are wholly funded by RTA.[29] RTA receives its funding through federal grants, states taxes, and transportation fees.[30]Accordingly, the Court finds that TMSEL is an agency or instrumentality of RTA and, consequently, that the TMSEL welfare benefit plan is a governmental plan and is excepted from the ERISA framework. Thus, this Court lacks subject matter jurisdiction over this case.

For the foregoing reasons,

**IT IS ORDERED** that the Defendants' motion is **GRANTED**.

**IT IS FURTHER ORDERED** that the above-captioned case is

---

[28] See Pls.' Ex. B to Suppl. Brief, Rec. Doc. 21-1, pp. 24-26, 28, 35 (describing the management relationship between RTA and TMSEL and noting that TMSEL's general manager and deputy general manager can only be appointed with the advice and consent of RTA; that RTA retains the right to issue new policies, rules, and regulations for the transit system; that RTA shall review all TMSEL pension documentation; that all hourly rates for any exceptional service fees shall be approved by RTA, that RTA shall audit and inspect all TMSEL books, data, and records; that TMSEL shall maintain its books at the direction of RTA and that treatment of revenue shall be directed by RTA).

[29] Defs.' Ex. B to Suppl. Brief, Rec. Doc. 20-1, p. 3 (noting specifically that from 1983 through 2009 RTA paid TMSEL's operating expenses, which included wages and benefits, and that RTA began directly funding the TMSEL benefits from 2009 to present); Pls.' Ex. B to Suppl. Brief, Rec. Doc. 21-1, p. 35 (noting specifically that RTA paid TMSEL's operating expenses, which included wages and benefits).

[30] The Court notes that the fact that funding for the welfare benefit plan comes from tax revenue is also important. In Hightower, the court explained that "Government plans received an exemption from ERISA because of their ability to tax and thereby avoid the pitfalls of underfunding." 65 F.3d at 449 (citations omitted). The RTA has the power to levy head and use taxes to fund its operations. La. Rev. Stat. § 1656.

**DISMISSED without prejudice.**

New Orleans, Louisiana this 10th day of May, 2013.

CARL J. BARBIER
UNITED STATES DISTRICT JUDGE