UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

MARY SMITH ET AL.                    CIVIL ACTION

VERSUS                               NO: 12-3059

REGIONAL TRANSIT                     SECTION: "J"(4)
AUTHORITY ET AL.

## ORDER & REASONS

Before the Court is a *Motion for Summary Judgment* **(Rec. Doc. 73)** filed by Defendants, the Regional Transit Authority ("RTA") and Transit Management of Southeastern Louisiana, Inc. ("TMSEL"); an opposition thereto (Rec. Doc. 80) filed by Plaintiffs; and a reply (Rec. Doc. 83) filed by Defendants. The motion was set for hearing on September 30, 2015, with oral argument. Having considered the motion, legal memoranda, and arguments of counsel; the record; and the applicable law, the Court finds that the motion should be **GRANTED**.

## FACTS AND PROCEDURAL BACKGROUND

This litigation arises out of claims asserted under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"); 42 U.S.C. § 1983 ("Section 1983"); and Louisiana law. Plaintiffs in this action are approximately forty former employees of New Orleans Public Service, Inc. ("NOPSI") and retirees of TMSEL. On December 31, 2012, Plaintiffs filed suit against Defendants, alleging violations of ERISA. (Rec.

Doc. 1.) Plaintiffs assert that Defendants wrongfully denied them benefits owed to them under their employee welfare benefits plan ("the Plan") in violation of 29 U.S.C. § 1132(a)(1)(B). Specifically, Plaintiffs allege that Defendants denied them premium-free medical insurance, quarterly Medicare premiums, and deductible reimbursements as guaranteed by the Plan. Plaintiffs also assert that Defendants breached their fiduciary duties under ERISA in violation of § 1132(a)(2).

On February 20, 2013, Defendants moved to dismiss the complaint on the grounds that the benefit plan at issue is not subject to ERISA because it falls within ERISA's "governmental plan" exemption. (Rec. Doc. 12.) After briefing and oral argument, this Court granted the motion and dismissed Plaintiffs' claims, finding that the RTA is a political subdivision, TMSEL is an agency or instrumentality of the RTA, and the Plan is therefore a governmental plan exempt from ERISA. (Rec. Doc. 26.) Plaintiffs appealed and, on June 23, 2014, the United States Court of Appeals for the Fifth Circuit vacated the judgment on procedural grounds. The Fifth Circuit held that Defendants' argument that the Plan was a governmental plan exempt from ERISA did not raise a jurisdictional question. *Smith v. Reg'l Transit Auth.*, 756 F.3d 340, 346 (5th Cir. 2014). Therefore, the proper procedural vehicle to raise the question of whether a purported ERISA plan is a governmental plan is

either Rule 12(b)(6) or, if factual information outside the pleadings is needed, Rule 56. *Id.* at 346-47.

Upon remand, the Court ordered Plaintiffs to file an amended and restated complaint setting forth all causes of action. On July 25, 2014, Plaintiffs filed their amended complaint, wherein they reassert their ERISA claims and add claims for "successor liability" under ERISA, a Section 1983 claim, and various claims under Louisiana law for tort and contractual causes of action related to Defendants' conduct in administering the Plan. (Rec. Doc. 40.) Defendants subsequently filed a motion for summary judgment. (Rec. Doc. 41.) At Plaintiffs' request, the parties were granted time to conduct discovery necessary to clarify the ownership, funding, and management of TMSEL. (Rec. Doc. 55.) The parties agreed for discovery to be limited to the year 2006 because that is when Plaintiffs claim they began paying out of pocket for their benefits under the Plan. (Rec. Doc. 59, at 2.) The Court instructed Defendants to refile their motion for summary judgment upon the completion of discovery.

The parties completed discovery, and Defendants filed the instant *Motion for Summary Judgment* **(Rec. Doc. 73)** on July 8, 2015. Pursuant to the schedule ordered by the Court, Plaintiffs responded in opposition on July 31, 2015. Defendants replied on August 6, 2015.

Plaintiffs' amended complaint and the parties' briefs set out the following relevant facts. Prior to 1983, the New Orleans transit system was operated by NOPSI, a private company. (Rec. Docs. 73-1, at 3; 80, at 2.) In the late 1970s and early 1980s, the system converted to a publicly held system, owned by the RTA and operated by TMSEL. (Rec. Docs. 73-1, at 3; 80, at 2.) As a result of the change in ownership and management, all employees of NOPSI became employees of TMSEL. (Rec. Docs. 73-1, at 4; 80, at 2.) At the time the RTA purchased the transit system, NOPSI, the transit union, and the City of New Orleans had a preexisting agreement ("13(c) Agreement") pursuant to the Urban Mass Transportation Act of 1964, which provided for "fair and equitable arrangements" for employee benefits. (Rec. Doc. 40, at 7.) In March 1983, the RTA and TMSEL, as successors to NOPSI, agreed that they would continue to provide the same benefits employees enjoyed under the preexisting 13(c) agreement. (Rec. Doc. 1-2, at 1.)

In June 1983, the RTA completed the purchase of the transit system from NOPSI. (Rec. Docs. 40, at 6; 73-1, at 3.) At the same time, the RTA, TMSEL, and NOPSI entered into an additional agreement, "The Employee and Retiree Pension and Welfare Benefit Agreement" (the "Benefit Agreement") which specifically recognized the RTA and TMSEL's benefit obligations. (Rec. Doc. 1-4.) The RTA became the sponsor of the Plan, and TMSEL became

4

the administrator. The Benefit Agreement provided that each employee transferred from NOPSI to the RTA or TMSEL would continue to receive the same coverage and benefit levels they received as an employee of NOPSI. *Id.* at 2-3. The Benefit Agreement also made the RTA and TMSEL responsible for making any payments due for any benefits of the former NOPSI employees, and established a funding structure to ensure that the pension benefits were maintainable. *Id.* at 4-7.

At the time of the purchase and agreements, the RTA was considered a public entity—a "political subdivision" of the state of Louisiana[1]—and TMSEL was a privately owned corporation, created in 1983 by an agreement between the RTA and ATE Management and Service Company to operate the transit system. (Rec. Doc. 21-1, at 1-2.) In 2004, the Louisiana State Legislature designated TMSEL as a political subdivision for litigation purposes. *See* La. Rev. Stat. § 13:5102. In 2009, TMSEL ceased operation and management of the transit system, and no longer provided services to the RTA. (Rec. Docs. 12-3, at 2; 73-5, at 7.) From 2009-2012, the public transportation was instead operated by a separate private corporation.[2] In 2012, the RTA became 100% owner of TMSEL. (Rec. Doc. 12-3, at 3.)

---

[1] The RTA was created by state statute on August 1, 1979, and defined as a "body politic and corporate and a political subdivision of the state of Louisiana." La. Rev. Stat. § 48:1654(A).
[2] In 2005, the RTA entered into a Cooperate Endeavor Agreement with Interregional Transit, Inc. ("Interregional") for the operation of the

According to Plaintiffs, from the system's private-to-public conversion in 1983 until March 2006, the RTA administered the Plan consistent with the Benefit Agreement: it provided premium-free medical insurance, life insurance, supplemental Medicare payments, and reimbursed Medicare premiums. (Rec. Doc. 40, at 12.) However, Plaintiffs allege that, in March 2006, the RTA and/or TMSEL stopped providing Medicare premiums and deductible reimbursements to retirees and began charging premiums for medical insurance. *Id.* Plaintiffs aver they were originally told the changes were temporary, but that they have continued until the present day. *Id.* Plaintiffs contend that the changes are in violation of ERISA or, alternatively, Louisiana law, and that they are owed the same welfare benefits that they received from NOPSI. *Id.* at 15, 18-21. Plaintiffs also allege that RTA and/or TMSEL breached their fiduciary duties to Plaintiffs under ERISA or, alternatively, Louisiana law. *Id.* at 15-16, 21-23. Lastly, Plaintiffs claim that Defendants violated their constitutional due process rights. *Id.* at 18.

## **LEGAL STANDARD**

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and

---

transit system. In 2008, TMSEL entered into an agreement with Veolia Transportation Services, Inc. ("Veolia") for a similar purpose. It is unclear which corporation was operating the system after TMSEL ceased operations in 2009.

that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008). Summary judgment is improper where the court merely believes it unlikely that the nonmoving party will prevail at trial. *Nat'l Screen Serv. Corp. v. Poster Exch., Inc.*, 305 F.2d 647, 651 (5th Cir. 1962). All reasonable inferences are drawn in favor of the nonmoving party, but a party cannot defeat summary judgment with conclusory allegations or unsubstantiated assertions. *Little*, 37 F.3d at 1075. A court ultimately must be satisfied that "a reasonable jury could not return a verdict for the nonmoving party." *Delta*, 530 F.3d at 399.

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264–65 (5th Cir. 1991). The nonmoving party can then defeat the motion by either countering with sufficient evidence of its own, or

"showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial. *See, e.g., id.* at 325; *Little*, 37 F.3d at 1075.

## PARTIES' ARGUMENTS AND DISCUSSION

### A.   ERISA Governmental Plan Exemption

Defendants contend that Plaintiffs' claims fail because the Plan is a governmental plan excluded from ERISA's coverage. Defendants assert that for the purposes of Title I, ERISA defines "governmental plan" as a plan established or maintained for its employees by the government of any State or political subdivision thereof, or by any agency or instrumentality of any of the foregoing. Defendants argue that the RTA and TMSEL, the entities who maintain the Plan, are political subdivisions. In

support, Defendants point to the definition of political
subdivision developed in *National Labor Relations Board v.
Natural Gas Utility District of Hawkins County, Tennessee*, 402
U.S. 600 (1971), which interpreted the same term in the National
Labor Relations Act ("NLRA"). Defendants argue that in *Hawkins*,
the United States Supreme Court held that "an entity is a
political subdivision if it is either (i) created by the State
so as to constitute a department or administrative arm of the
government, or (ii) administered by individuals who are
responsible to public officials or the general electorate." *Id.*
at 604-05. Defendants assert that in this case, both RTA and
TMSEL are currently designated as political subdivisions by
state statute. Moreover, they contend that the members of RTA
are appointed by public officials. Lastly, they claim that in
2009, TMSEL ceased operations and no longer provided services to
RTA, and in January 2012, RTA became 100% owner of TMSEL.
Therefore, Defendants assert that these facts eliminate any
argument that the Plan is administered by a private corporation.
As such, they contend that this is a governmental plan under
ERISA.

    In the alternative, Defendants argue that TMSEL was and is
an agency or instrumentality of the RTA. In support, Defendants
contend that the appropriate test for determining whether an
entity is an agency or instrumentality is the six-factor test

provided in the Internal Revenue Code, Revenue Ruling 57-128. Defendants argue that the TMSEL qualifies as an agency or instrumentality under this test because its sole purpose was to manage the public mass transit system in furtherance of the RTA's governmental obligations, it carried out its public function under the exclusive direction and control of the RTA, the RTA presently owns 100% of TMSEL's outstanding capital stock, the RTA exercised exclusive control over the managerial personnel of TMSEL, the Louisiana legislature designated TMSEL a political subdivision in 2004, and the RTA has been the sole source of TMSEL's funding since TMSEL's inception.

In response, Plaintiffs argue that Defendants have the burden of showing that the Plan is a governmental plan exempt from ERISA and they fail to do so. First, Plaintiffs argue that Defendants fail to demonstrate that TMSEL is an agency or instrumentality of RTA. According to Plaintiffs, this Court should not apply the six-factor test set forth in IRS Revenue Ruling 57-128 because it is an inferior test that was not developed in the context of employment-related claims. Instead, Plaintiffs contend this Court should apply the "employment relationship" test enunciated in *Alley v. Resolution Trust Corp.*, 984 F.2d 1201 (D.C. Cir. 1993), which evaluates the entity within the context of the employment relationship rather than engaging in an all-purpose characterization. Under the

10

employment-relationship test, Plaintiffs argue that TMSEL is not an agency or instrumentality because TMSEL's employment relationship with Plaintiffs is specially crafted as a non-governmental one.

In the alternative, Plaintiffs argue that TMSEL is not an agency or instrumentality even under the factors set forth in IRS Revenue Ruling 57-128 for the following reasons. First, relative to the rights of its employees, TMSEL was created to avoid any governmental characterization so that the employees' collective bargaining and other private rights would be preserved. Second, TMSEL performed its function directly on behalf of Metro New Orleans Transit, Inc. ("Metro"), which utilized TMSEL to satisfy its contractual obligations to RTA. Third, extensive private interests are involved and, prior to 2012, TMSEL was wholly owned by private companies. Fourth, TMSEL is an entity separate and apart from RTA, and TMSEL's board members are elected by its shareholders. Fifth, statutory authority was not necessary to create TMSEL. Sixth, although RTA funded TMSEL's operating expenses, RTA was not the employer of any of TMSEL's employees.

Second, Plaintiffs argue that Defendants fail to demonstrate that RTA is a political subdivision. According to Plaintiffs, the *Hawkins* test does not apply to transit workers who have collective bargaining rights under the NLRA. Because

the *Hawkins* test does not apply to determine Plaintiffs'
employment rights in the labor relations context, the context in
which the test was conceived, Plaintiffs argue that the test
also cannot apply to define their rights in the ERISA context.

In the alternative, Plaintiffs argue that the RTA is not a
political subdivision even under the *Hawkins* test. Plaintiffs
contend that the Court in *Hawkins* considered multiple factors to
assess whether the entity in question possessed indicia of
sovereign authority and governmental control. Under such an
inquiry, Plaintiffs argue that the RTA is a hybrid entity that,
while governmental for some purposes, is not governmental for
ERISA purposes.

In reply, Defendants argue that Plaintiffs have
misinterpreted and misstated the pertinent ERISA case law.
Furthermore Defendants allege that Plaintiffs have made several
immaterial statements of fact in an effort to defeat summary
judgment and misdirect the Court. First, Defendants contend that
Plaintiffs' argument that the RTA cannot satisfy the test in
*Hawkins* is incomprehensible given the undisputed fact that the
RTA was created by the State of Louisiana pursuant to a public
act. Second, Defendants point out that Plaintiffs continue to
rely solely on the employment-relationship test set forth in
*Alley* and previously rejected by this Court. Defendants maintain
that it is proper for the Court to focus on the status of the

entities at issue, as opposed to the employment relationship, because federalism concerns exist given the involvement of state-related entities. Thus, the Court should apply IRS Revenue Ruling 57-128 to conclude that TMSEL is an agency or instrumentality of RTA.

Moreover, Defendants allege that there is no factual dispute that the RTA solely funded TMSEL's operating expenses, including Plan benefits, since TMSEL's inception. In addition, Defendants argue that the RTA exercised substantial control over TMSEL, such as by controlling appointments of TMSEL's officers and key personnel, exercising budgetary control, and providing all funding to TMSEL, despite the previous ownership of TMSEL's stock by private corporations. For this reason, Defendants maintain that the ownership of TMSEL's stock by entities prior to the RTA's ownership of TMSEL's stock does not negate the fact that the RTA had substantial control over TMSEL since its inception.

As an initial matter, the parties disagree about which party bears the burden of proof regarding the governmental plan exemption. In the Fifth Circuit's opinion, the court held that the actual existence of a plan covered by ERISA is not a jurisdictional prerequisite, but more properly characterized as an element of a plaintiff's claim. *Smith*, 756 F.3d at 345 & n.5 (citing *Dahl v. Charles F. Dahl, M.D., P.C. Defined Ben. Pension*

*Trust*, 744 F.3d 623, 629 (10th Cir. 2014) ("[R]ecent Supreme Court decisions compel the conclusion that the existence of a benefit plan subject to ERISA is . . . an element of a claim under ERISA."); *Daft v. Advest, Inc.*, 658 F.3d 583, 587 (6th Cir. 2011) ("[T]he existence of an ERISA plan is a nonjurisdictional element of Plaintiffs' ERISA claim.")). Accordingly, the case law supports Defendants' argument that Plaintiffs have the burden of proving the actual existence of a plan covered by ERISA; that is, a plan that does not fall within the governmental plan exemption. Plaintiffs point to no authority to support their contention that Defendants bear the burden of proof. Even so, the Court need not determine which party has the burden on this issue, as Defendants have come forth with sufficient evidence showing that the Plan is a governmental plan.

The principal question before the Court is whether the benefit plan in this case is a "governmental plan" and therefore exempt from ERISA. Congress enacted ERISA to provide comprehensive regulation of employee benefit plans. *Aetna Health, Inc. v. Davila*, 542 U.S. 200, 208 (2004). Under ERISA, an employee benefit plan is defined as "any plan, fund, or program . . . established or maintained by an employer . . . for the purpose of providing for its participants or their beneficiaries . . . benefits in the event of sickness, accident,

14

disability, death or unemployment." 29 U.S.C. § 1002(1). Although ERISA's scope is expansive, certain types of employee benefit plans are excluded from its coverage. Specifically, Congress decided that any employee benefit plan that is a "governmental plan" should be excluded from the ERISA framework. *See id.* § 1003(b)(1). Title I of ERISA defines a governmental plan as "a plan established or maintained for its employees by the Government of the United States, by the government of any State or political subdivision thereof, or by any agency or instrumentality of any of the foregoing." *Id.* § 1002(32). The Fifth Circuit has explained that the definition of governmental plan under Title I is disjunctive and, therefore, a plan may be considered to be a governmental plan where a party can prove that it was either (1) established by an entity falling within the confines of the aforementioned definition, or (2) that it is currently maintained by such an entity. *Hightower v. Tex. Hosp. Ass'n*, 65 F.3d 443, 450 (5th Cir. 1995). Defendants have not argued that the Plan was established by a governmental entity, but rather than the Plan has been maintained by a governmental entity. Thus, the Court must determine whether RTA and/or TMSEL constitute political subdivisions, agencies, or instrumentalities of the United States, Louisiana, or any political subdivision of either.

### 1. Political Subdivision

ERISA does not define the term political subdivision. *See Koval v. Wash. Cnty. Redevelopment Auth.*, 574 F.3d 238, 240 (3rd Cir. 2009) (noting that the ERISA statute does not define political subdivision). Likewise, it appears that the Fifth Circuit has not directly addressed whether an entity is a political subdivision for the purposes of ERISA. The Second Circuit, Third Circuit, and Seventh Circuit interpret "political subdivision" according to the standard used in *Hawkins*. *See Koval*, 574 F.3d at 241; *Shannon v. Shannon*, 965 F.2d 542, 547 (7th Cir. 1992); *Rose v. Long Island R.R. Pension Plan*, 828 F.2d 910, 915-16 (2d Cir. 1987). Additionally, one district court within the Fifth Circuit has applied the *Hawkins* test to ERISA. *See Scott v. Unum Life Ins. Co. of Am.*, No. 09-0922, 2010 WL 114404, at *5 (W.D. La. Jan. 11, 2010).

In *Hawkins*, the Supreme Court considered whether a utility district fell within the political subdivision exception to its jurisdiction under the NLRA. 402 U.S. at  601. Like ERISA, the NLRA did not define the term "political subdivision," nor did the legislative history indicate that Congress had considered its meaning. *Id.* at 604. Therefore, the Court adopted the criteria typically applied by the National Labor Relations Board ("NLRB") in agency determinations. Specifically, the Court found that the proper test considers whether an entity is either

16

"created directly by the state, so as to constitute departments or administrative arms of the government," or "administered by individuals who are responsible to public officials or to the general electorate." *Id.* at 604-05. The Court concluded that the utility district was a political subdivision under this two-prong test. In further support of its decision, the Court noted that the utility district had the power of eminent domain, was a public corporation under state law, and that the district's property and revenues were exempt from all state and local taxes. *Id.* at 606-07.

Similarly, in *Rose v. Long Island Railroad Pension Plan*, the Second Circuit determined the Metropolitan Transit Authority was a political subdivision under the *Hawkins* test. The court explained that "[t]he NLRB guidelines are a useful aid in interpreting ERISA's governmental exemption, because ERISA, like the National Labor Relations Act, 'represents an effort to strike an appropriate balance between the interests of employers and labor organizations.'" *Id.* (quoting H.R. Rep. No. 522, 1974 U.S. Code Cong. & Ad. News at 4647). Likewise, both the Third and Seventh Circuits have explained that ERISA's broad concerns with balancing federalism and labor relations parallel the concerns raised by the NLRA and, therefore, make the *Hawkins* test the proper test for determining whether an entity is a political subdivision under ERISA as well. *See Koval*, 574 F.3d

at 241-43; *Shannon*, 965 F.2d at 547-48. Accordingly, the Court finds that the *Hawkins* test is the appropriate test for determining whether an entity is a political subdivision and will proceed with that analysis.

The *Hawkins* test comprises two prongs, only one of which need be satisfied. The entity is a political subdivision if it is "*either* (1) created directly by the state, so as to constitute departments or administrative arms of the government, *or* (2) administered by individuals who are responsible to public officials or to the general electorate." *Shannon*, 965 F.2d at 548 (quoting *Hawkins*, 402 U.S. at 604-05). Under this test, it is clear that the RTA is a political subdivision of Louisiana. The RTA, "a body politic and a corporate and political subdivision of the state," was created on August 1, 1979, by public act. *See* La. Rev. Stat. § 48:1654. The RTA's stated purpose is "to plan, design, lease as lessee, purchase, acquire, hold, own, construct, improve, have an equity in, finance, maintain, and administer a transit system within the metropolitan area." *Id.* These purposes are for the benefit of the people of Jefferson, Orleans, St. Bernard, and St. Tammany parishes (the geographical area in which RTA was created). Thus, the RTA meets the first prong of the *Hawkins* test because it was "created directly by the state, so as to constitute [a] department[] or administrative arm[] of the government." *See*

*Hawkins*, 402 U.S. at 604-05. Therefore, the RTA is a political subdivision of Louisiana for the purposes of ERISA.

In addition, the RTA meets the second prong of the *Hawkins* test. The RTA is administered by a board consisting of "three members from each participating parish, [who are] appointed by the chief executive officer of that parish, subject to the approval of its governing authority" as well as two additional members who are appointed "by the chief executive officer for the parish with the greatest percentage of public transit revenue." La. Rev. Stat. § 48:1655. These members are recommended by the legislative delegation of each parish. *Id.* All members "serve at the pleasure of the appointing authority." *Id.* Thus, the RTA is "administered by individuals who are responsible to public officials or the general electorate." *See Hawkins*, 402 U.S. at 604-05. As such, the Court concludes that the RTA is a political subdivision under either prong of the disjunctive *Hawkins* test and is therefore a political subdivision under ERISA.

Although Plaintiffs argue that the RTA is not a political subdivision under the *Hawkins* test because it lacks the power of eminent domain, its members are prohibited from holding public office, and it lacks the full taxing authority typically reserved for governmental entities, Plaintiffs fail to demonstrate that any of these factors are required to satisfy

the two-prong *Hawkins* test. The factors discussed by Plaintiffs may be worth noting, but they are not part of the *Hawkins* test. *See Koval*, 574 F.3d at 243-44. As mentioned above, the *Hawkins* test comprises two prongs, only one of which need be satisfied. Here, the RTA satisfies both prongs and is therefore a political subdivision.

Defendants also argue that TMSEL qualifies as a political subdivision under the *Hawkins* test. Because the Court finds that TMSEL more precisely fits the description of an agency or instrumentality under ERISA, it declines to analyze TMSEL's status as a political subdivision and makes no conclusion on that point.

### 2.    Agency or Instrumentality

ERISA does not define the terms agency or instrumentality. *See Rose*, 828 F.2d at 917. The parties have proposed two different tests for determining whether an entity is an agency or instrumentality.

Defendants argue that the appropriate test for determining whether an entity is an agency or instrumentality is the six-factor test provided in IRS Revenue Ruling 57-128, which has been adopted by the Second Circuit. *See Rose*, 828 F.2d at 917-18. In contrast, Plaintiffs assert that the proper test is the *Alley* test, which is a three-factor test developed by the D.C. Circuit. *See Alley*, 984 F.2d at 1206. Specifically, Plaintiffs

argue that this three-factor test is appropriate because it emphasizes the employment relationship between the entity in question and its employees.[3] Plaintiffs assert that the leading Fifth Circuit case addressing governmental plans under ERISA, *Hightower v. Texas Hospital Association*, focuses on the importance of the employment relationship in making determinations as to whether a plan is an ERISA plan.[4] Therefore, Plaintiffs contend that this test best comports with Fifth Circuit case law.

As this Court explained in its previous ruling in this case, the Court does not disagree with Plaintiffs' characterization of the Fifth Circuit's focus in *Hightower* on the employment relationship; however, it does not find that Fifth Circuit precedent requires that the Court apply the *Alley* test. Rather, the Revenue Ruling test is more appropriate in the instant case. *See Rose*, 828 F.2d at 918 ("Because the IRS is one of the agencies charged with administering ERISA, its interpretations of the statute are entitled to great deference."). The Third Circuit has similarly held that the

---

[3] The *Alley* test, as Plaintiffs characterize it, focuses on the following factors: (1) if the employee is excluded from the state civil service system; (2) if the employee is subject to governmental personnel rules and salary restrictions; and (3) if the employee is allowed to participate in the pension and welfare plans reserved for civil servants and state employees. *See Alley*, 984 F.2d at 1206-07.

[4] In particular, Plaintiffs' argument refers to the fact that when determining whether a plan's status had changed under Title IV of ERISA, the court in *Hightower* emphasized that the "governmental entity's status as employer" was important. 65 F.3d at 448 (quoting *Roy v. Teachers Ins. and Annuity Ass'n*, 878 F.2d 47, 50 (2d Cir. 1989)).

employment-relationship test is inapposite in cases dealing with a potential state rather than federal government entity. *See Koval*, 238 F.3d at 240-41.

In particular, the Court notes that in applying the employment-relationship test, the court in *Alley* specifically explained that "a [Revenue Ruling] test focusing broadly on the extent of governmental contacts may be more appropriate [than the employment-relationship test] where state-affiliated entities are concerned." *Alley*, 984 F.2d at 1205-06 n.11. At multiple points in the opinion, the court in *Alley* emphasized that the entity involved was affiliated with the federal government, which did not implicate the same federalism concerns present when considering entities affiliated with state governments. *Id.* As such, the court did not have to address the federalism concerns that are prevalent throughout ERISA's legislative history and, consequently, are also the primary reason that the governmental plan exception was created. *See, e.g., Hightower*, 65 F.3d at 448 (discussing ERISA's legislative history and noting that "Congress was reluctant to interfere with the administration of public retirement plans due to the resulting federalism implications"); *Rose*, 828 F.2d at 914 (discussing the federalism concerns underlying the governmental plan provision). In the instant case, such federalism concerns *are* present and, therefore, require that the Court look more

22

broadly at the relationship between TMSEL and the state, not just the relationship between TMSEL and its employees. *See Koval*, 238 F.3d at 241-42 (finding that the *Alley* test should not apply where federalism concerns are implicated). Thus, the Court finds that the six-factor test set forth in Revenue Ruling 57-128 is the appropriate test for determining whether TMSEL is an agency or instrumentality of the RTA.

In Revenue Ruling 57-128, the IRS set forth the following six factors to be considered in determining whether a particular entity is an agency or instrumentality of a state or political subdivision:

> (1) whether it is used for a governmental purpose and performs a governmental function; (2) whether performance of its function is on behalf of one or more states or political subdivisions; (3) whether there are any private interests involved, or whether the states or political subdivisions involved have the powers and interests of an owner; (4) whether control and supervision of the organization is vested in public authority or authorities; (5) if express or implied statutory or other authority is necessary for the creation and/or use of such an instrumentality, and whether such authority exists; and (6) the degree of financial autonomy and the source of its operating expenses.

Rev. Rul. 57-128, 1957-1 C.B. 311. "One of the most important factors to be considered . . . is the degree of control that the [political subdivision] has over the organization's everyday operations." Rev. Rul. 89-49, 1989-1 C.B. 117.[5]

---

[5] The IRS refined its six-factor criteria in Revenue Ruling 89-49. The factors outlined in Revenue Ruling 57-128 and 89-49 are quite similar and compel the

Under the six-factor test articulated in Revenue Ruling 57-128, TMSEL is either an agency or instrumentality of the RTA. First, TMSEL was created specifically to manage and operate the public transportation system in Jefferson, Orleans, St. Bernard, and St. Tammany parishes.[6] As the Court noted in its analysis of the RTA, the transportation system is for the benefit of the public in those parishes and, for this reason, TMSEL is arguably performing a governmental purpose and function. Moreover, the Cooperative Endeavor Agreement entered into by the RTA for TMSEL to operate the transit system expressly declares that operation of the transit system serves a public purpose. (Rec. Doc. 21-1, at 9-10.)

Second, TMSEL performs this function specifically on behalf of the RTA, a political subdivision of Louisiana. As mentioned, "TMSEL's mission was basically to provide for the day-to-day operations of the [RTA]." (Rec. Docs. 73-5, at 5; 80-2, at 34.) Plaintiffs argue that TMSEL performed its function directly on

same result here. Because the parties briefed the application of the factors articulated by the IRS in Revenue Ruling 57-128, the Court will focus its discussion on those six factors.

[6] Plaintiffs cite the Cooperative Endeavor Agreement ("CEA") dated February 25, 2005, between the RTA, Interregional, and TMSEL to support its proposition that TMSEL was not used for a governmental purpose because "[r]elative to the rights of its employees," TMSEL was created so that its employees' collective bargaining rights and other private rights under the NLRA would be preserved. (Rec. Doc. 80, at 16.) However, Plaintiffs' argument in this regard is better suited for an employment-relationship test, such as the test set forth in *Alley*. Here, the proper focus is on the broad purpose of TMSEL. As the CEA explains, TMSEL was created specifically to "provide all management and operational staff for the Transit System." (Rec. Doc. 21-1, at 5.) TMSEL's "critical mission" was public transportation (Rec. Doc. 73-5, at 9); that is, "to provide for the day-to-day operations of the [RTA]." (Rec. Doc. 80-2, at 34.)

behalf of its parent companies, such as Metro, which utilized TMSEL to satisfy its contractual obligations to the RTA. However, Plaintiffs point to no other function performed by TMSEL other than to operate the transit system, which was ultimately the obligation of the RTA. Although Plaintiffs argue that TMSEL could not have performed its function on behalf of the RTA after 2009, as Defendants contend that TMSEL has not provided services to the RTA since it ceased operations in 2009, Plaintiffs have not demonstrated that TMSEL performed *any* function after 2009 or that TMSEL was not performing its function on behalf of the RTA in March 2006, when Plaintiffs' causes of action arose.

Third, although there are private interests involved in the Plan because TMSEL is a private corporation and NOPSI, TMSEL's predecessor, was also a private corporation, the RTA has the powers and interests of an owner. TMSEL's status as a corporation does not prevent it from being an agency or instrumentality of a political subdivision. *See Wilcox v. Terrytown Fifth Dist. Volunteer Fire Dep't, Inc.*, 897 F.2d 765, 767 (5th Cir. 1990) (holding volunteer fire department, a non-profit corporation, was an agency of a political subdivision for purposes of Fair Labor Standards Act). Moreover, TMSEL is currently 100% owned by RTA, a political subdivision of the state. Prior to the RTA's acquisition of TMSEL's stock in 2012,

the RTA exercised substantial control over TMSEL and was the sole source of TMSEL's funding. Accordingly, the RTA currently has the "powers and interests of an owner," and at the time Plaintiffs' causes of action arose in 2006, the RTA exercised the powers of an owner.

Fourth, and most importantly, throughout its existence TMSEL has operated with a high degree of oversight and control by the RTA. Plaintiffs attempt to create factual issues on this point by arguing that TMSEL was controlled by its private parent companies, TMSEL was an independent contractor, audit reports describe TMSEL as an entity separate from the RTA, and TMSEL is not subject to Louisiana's Open Meetings law. (Rec. Doc. 80, at 20-21.) However, Plaintiffs overlook the fact that the RTA nevertheless exercised substantial control over TMSEL.[7] While it is true that TMSEL's Bylaws state that TMSEL appoints its own officers, the 2005 CEA between the RTA and Interregional provides that TMSEL must appoint its board members with the advice and consent of the RTA. (Rec. Doc. 21-1, at 10.) Lastly, Plaintiffs claim that a genuine issue of material fact exists

---

[7]The Management Services Agreement ("MSA") dated October 1, 2001, between the RTA, Metro, and TMSEL reflects the control the RTA exercised over TMSEL. *See* Rec. Doc. 21-1, at 24-26, 28, 35 (describing the management relationship between the RTA and TMSEL and noting that TMSEL's general manager and deputy general manager can only be appointed with the advice and consent of the RTA; that the RTA retains the right to issue new policies, rules, and regulations for the transit system; that the RTA shall review all TMSEL pension documentation; that all hourly rates for any exceptional service fees shall be approved by the RTA, that the RTA shall audit and inspect all TMSEL books, data, and records; that TMSEL shall maintain its books at the direction of the RTA and that treatment of revenue shall be directed by the RTA).

regarding whether the RTA ever audited or had the power to audit TMSEL's books. However, the RTA's 30(b)(6) deponents do not appear to disagree on this issue. Mr. Haley testified that "the RTA always has had audit control, and audits were always conducted." (Rec. Doc. 73-4, at 7.) Mr. Major did not disagree, but rather testified that he is "not aware of a specific audit of TMSEL's books." (Rec. Doc. 80-2, at 44.) Therefore, it follows that control and supervision of TMSEL is vested in the RTA.

Fifth, the statute that created the RTA authorizes it to contract with a party, such as TMSEL, to operate and maintain its mass transit system. *See* La. Rev. Stat. § 48:1656(4). Plaintiffs' argument that the fifth factor weighs against the conclusion that TMSEL was an agency or instrumentality because TMSEL was not created by legislation is misguided. The fifth factor of the Revenue Ruling test asks whether "statutory or other authority is necessary for the creation and/or *use* of such an instrumentality." Rev. Rul. 57-128, 1957-1 C.B. 311 (emphasis added). If the fifth factor required that the instrumentality be created by statutory authority, then all such instrumentalities would qualify as political subdivisions under the first prong of the *Hawkins* test. *See Hawkins*, 402 U.S. at 604-05. Plaintiffs also distinguish the applicable Louisiana statute here, which authorizes the RTA to contract with a private party, from the

New York statute at issue in *Rose*, which permitted the MTA to delegate operations to a wholly owned subsidiary. *See Rose*, 828 F.2d at 918 (citing N.Y. Pub. Auth. Law § 1266(5)). Although the RTA contracted with TMSEL to perform functions on its behalf pursuant to express statutory authority, Plaintiffs correctly point out differences between the statute applicable here and the statute in *Rose*.

Lastly, TMSEL's operating expenses are wholly funded by the RTA.[8] From its inception, TMSEL has been funded solely by the RTA. (Rec. Doc. 20-1, at 3.) Plaintiffs do not dispute that the RTA agreed to fund TMSEL's operations, but rather argue that the RTA also distanced itself from TMSEL's employment relationship with its employees. (Rec. Doc. 80, at 23.) Again, Plaintiffs' arguments focus narrowly on the employment relationship. While the employment relationship is a proper focus under the *Alley* test, the Revenue Ruling test focuses more broadly on the extent of governmental contacts. The RTA receives its funding through federal grants, state taxes, and transportation fees.[9] The fact that the RTA paid TMSEL's operating expenses, which included wages and benefits, weighs heavily in favor of finding that

---

[8] As reflected in the MSA, the RTA was responsible for providing TMSEL the funds needed to operate and manage the transit system, including the payment of wages and benefits. (Rec. Doc. 20-3, at 13.)

[9] The fact that funding for the welfare benefit plan comes from tax revenue is also important. In *Hightower*, the Fifth Circuit explained that "Government plans received an exemption from ERISA because of their ability to tax and thereby avoid the pitfalls of underfunding." 65 F.3d at 449. The RTA has the power to levy head and use taxes to fund its operations. La. Rev. Stat. § 48:1656.

TMSEL was an agency or instrumentality of the RTA. *Cf. Gualandi v. Adams*, 385 F.3d 236, 244 (2d Cir. 2004) ("[E]xclusive governmental funding is enough to constitute governmental establishment of a plan.").

Considering the undisputed facts regarding the RTA and TMSEL set forth in the record and cited in the parties' briefs, the Court concludes that when Plaintiffs' causes of action arose in March 2006, the RTA was a political subdivision of Louisiana and TMSEL was an agency or instrumentality of the RTA. TMSEL maintained the Plan for its employees. Therefore, the Plan was maintained by an agency or instrumentality of a political subdivision. For this reason, the Plan was a governmental plan excluded from ERISA's coverage in March 2006,[10] and it remains a governmental plan now. Accordingly, Defendants are entitled to summary judgment in their favor on all of Plaintiffs' ERISA claims.

**B.   ERISA Successor Liability Claims**

In the event that the RTA is not directly liable under ERISA, Plaintiffs claim in the alternative that the RTA is liable under the law of successor liability. (Rec. Doc. 40, at 17.) Plaintiffs contend that even if the Plan is now a

---

[10] The Court notes that the parties agreed for discovery to be limited to the year 2006. (Rec. Doc. 59, at 2.) However, to the extent that Plaintiffs now object to the temporal scope of discovery (*see* Rec. Doc. 80, at 8, 18 n.88, 19 n.90, 28 n.132, 29), their objections are untimely. Plaintiffs were entitled to seek review of the Magistrate Judge's order within fourteen days after being served with a copy. Fed. R. Civ. P 72(a).

governmental plan, the RTA bears successor liability for the ERISA violations that occurred prior to time the Plan became governmental.

Defendants argue that there is no cognizable legal basis for successor liability under ERISA against a political subdivision because Congress has excluded these state actors from ERISA's coverage. (Rec. Doc. 73-1, at 20.) First, Defendants claim that the RTA did not continue TMSEL's operations, but rather it shut them down. *Id.* Defendants point out that TMSEL has no employees and it no longer operates the transit system. Second, Defendants argue that if TMSEL were deemed to be the RTA's "alter ego," any ERISA claim against TMSEL fails because of the governmental plan exemption. *Id.* at 21. Third, Defendants assert that the federal common law cannot indiscriminately fill gaps to impose liability when Congress has excluded a claim from direct coverage by ERISA. *Id.* Defendants also distinguish the cases cited by Plaintiffs in their amended complaint, noting that those cases involved private parties and their contribution liability to multiemployer trusts under the ERISA Multiemployer Amendments Act of 1980. *Id.* at 20 (citing *Einhorn v. M.L. Ruberton Const. Co.*, 632 F.3d 89 (3d Cir. 2011); *Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323 (7th Cir. 1990)). In sum, Defendants contend that any liability that RTA has assumed for TMSEL's

debts arises under state law, to be adjudicated in state court. *Id.* at 20.

In response, Plaintiffs assert that courts have held successor entities liable under federal law for the ERISA violations of predecessor entities. (Rec. Doc. 80, at 28.) According to Plaintiffs, a successor is liable if the successor (1) continues the predecessor's operations and (2) had knowledge of the predecessor's liability. *Id.* (citing *Einhorn*, 632 F.3d 89; *Artistic Furniture*, 920 F.2d 1323). First, Plaintiffs argue that the RTA continued the operations of TMSEL because the RTA became "the assignee of all TMSEL contracts and rights arising out of the management and operation of the Transit System," pursuant to the 2012 Dissolution Agreement. *Id.* (quoting Rec. Doc. 13-10, at 3). Second, Plaintiffs argue that the RTA cannot reasonably dispute that it knew of TMSEL's ERISA liability because the RTA asserts that it exercised control over TMSEL since 1983. *Id.* Lastly, according to Plaintiffs, ERISA is silent on successor liability in the governmental plan context, inviting the application of federal common law. *Id.* at 29-30.

Because the Court determines that TMSEL was an agency or instrumentality of the RTA in March 2006, prior to the RTA's acquisition of 100% of TMSEL's stock, the Court need not consider whether the RTA, a political subdivision, may be held

31

liable for ERISA violations under successor liability.[11] The Plan was a governmental plan excluded from ERISA in 2006 and clearly once the RTA acquired full ownership of TMSEL in 2012. Despite TMSEL being owned by other private entities prior to 2012, the RTA exercised substantial supervision and control over TMSEL. Plaintiffs rely on this fact to demonstrate that the RTA must have known about TMSEL's alleged liability, which according to Plaintiffs is the second prong of their successor liability claim. It is largely due to this control that the Court concludes that TMSEL was an agency or instrumentality of the RTA and, therefore, that the Plan is exempt from ERISA. For this reason, any claim against TMSEL for which Plaintiffs argue the RTA is responsible does not arise under ERISA.

## C.   Section 1983 Claims

In the alternative to their claims under ERISA, Plaintiffs assert claims under Section 1983, alleging that Defendants violated their federally protected property rights. (Rec. Doc. 40, at 18.) Defendants contend that Plaintiffs' Section 1983 claims fail as a matter of law and are time-barred. (Rec. Doc. 73-1, at 22.) In support of their argument that Plaintiffs'

---

[11] The Court notes that holding a governmental entity liable under ERISA through successor liability may conflict with the federalism-based concerns which led Congress to exempt governmental plans in the first place. *See Rose*, 828 F.2d at 920 (noting that if a plan that was established by a private entity but subsequently taken over by a government body would continue to be subject to ERISA, such an outcome would conflict with the federalism-based concerns that caused Congress to exclude governmental plans).

Section 1983 claims fail on the merits, Defendants make three contentions. First, Defendants argue that Plaintiffs cannot identify any contractual right of which they have been deprived because they were not signatories to the June 1983 agreement nor were they intended recipients of the funding mechanism referenced in that agreement. *Id.* at 23. Second, Defendants argue that the retirement benefits at issue do not constitute protected property interests. *Id.* Third, Defendants argue that Plaintiffs have available state court procedures and remedies to address their purported contract-based claims. *Id.* Lastly, Defendants assert that Plaintiffs' Section 1983 claims are time-barred under the one-year prescriptive period applicable to such claims. *Id.*

In response, Plaintiffs contend that Defendants are not entitled to summary judgment on their alternative Section 1983 claims. (Rec. Doc. 80, at 30.) First, Plaintiffs argue that they possess protected contractual rights to benefits as third-party beneficiaries of the 13(c) Agreement. *Id.* Second, Plaintiffs argue that because their benefits have vested, they can establish a protected property interest under Section 1983. *Id.* Third, Plaintiffs argue that Defendants provide insufficient evidence that there are available state court procedures and remedies that preclude Section 1983 claims. Fourth, Plaintiffs contend that their Section 1983 claims are not time-barred. *Id.*

33

at 31. According to Plaintiffs, Defendants' continuing refusal to reinstate benefits to which Plaintiffs are entitled and to reimburse Plaintiffs for the costs and expenses incurred constitute ongoing and continuing torts, preventing the accrual of prescription. *Id.* In addition, Plaintiffs argue that the doctrine of *contra non valentem* applies and prescription could not have commenced to run immediately upon the denial of benefits in 2006 because Plaintiffs were led to believe that the changes were only temporary. *Id.*

In reply, Defendants argue that Plaintiffs have no constitutionally protected property interest because no document guarantees Plaintiffs' right to the benefits they seek and welfare benefits do not vest. (Rec. Doc. 83, at 14-15.) Defendants also maintain that Plaintiffs' Section 1983 claims are time-barred, arguing that Plaintiffs fail to present any facts proving that they were prevented from filing suit before December 30, 2012, other than their mistaken, subjective belief that premium-free benefits would return. *Id.* at 16. In addition, Defendants argue that Plaintiffs' reliance on the continuing violation theory is inapplicable here, because the statute of limitations may not be tolled under this theory when the alleged violation merely has lingering effects. *Id.* at 16 n.46 (citing *McGregor v. La. State Univ. Bd. of Sup'rs*, 3 F.3d 850, 867 (5th Cir. 1993)).

To state a claim under Section 1983, plaintiffs must allege two elements: "first, that they were deprived of a right or interest secured by the Constitution and laws of the United States, and second, that the deprivation occurred under color of state law." *Doe v. Rains Cnty. Indep. Sch. Dist.*, 66 F.3d 1402, 1406 (5th Cir. 1995). "In order for a person to have a property interest within the ambit of the Fourteenth Amendment, he 'must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.'" *Blackburn v. City of Marshall*, 42 F.3d 925, 936 (5th Cir. 1995) (quoting *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972)).

Because there is no federal statute of limitations for Section 1983 claims, courts look for comparison to the forum state's statute of limitations for personal injury claims. *Wallace v. Kato*, 549 U.S. 384, 387 (2007). Section 1983 claims are best characterized as personal injury actions. *Jacobsen v. Osborne*, 133 F.3d 315, 319 (5th Cir. 1998). In Louisiana, personal injury claims are governed by Civil Code article 3492, which provides for a prescriptive period of one year from the date of injury or damage. La. Civ. Code art. 3492. On the other hand, federal law determines when a Section 1983 claim accrues. *Jacobsen*, 133 F.3d at 319 (citing *Moore v. McDonald*, 30 F.3d 616, 620 (5th Cir. 1994)). "Under federal law, a cause of action

35

accrues when the plaintiff knows or has reason to know of the injury which is the basis of the action." *Gartrell v. Gaylor*, 981 F.2d 254, 257 (5th Cir. 1993). In applying the forum state's statute of limitations, a federal court should also give effect to any applicable tolling provisions. *Id.*

In the instant case, Plaintiffs admit that TMSEL informed them in 2006 that they would be required to contribute to the cost of health insurance premiums and that that TMSEL had discontinued reimbursement of Medicare premiums and deductibles. (Rec. Doc. 40, at 12.) At that time Plaintiffs had reason to know of the injury which is the basis of their Section 1983 claims. Accordingly, the one-year prescriptive period began to run from that date.

Because their Section 1983 claims are prescribed on the face of the complaint, Plaintiffs have the burden of proving that their claims are not time-barred. *Taranto v. La. Citizens Prop. Ins. Corp.,* 62 So. 3d 721, 726 (La. 2011). Plaintiffs cannot rely on the continuing violation theory here. A continuing tort is occasioned by continual unlawful acts, not the continuation of the ill effects of an original, wrongful act. *Hogg v. Chevron USA, Inc.*, 45 So. 3d 991, 1003 (La. 2010). "The inquiry is essentially a conduct-based one, asking whether the tortfeasor perpetuates the injury through overt, persistent, and ongoing acts." *Id.* In the instant case, Defendants' alleged

conduct does not constitute a continuing tort. Rather, Defendants' "continuing refusal to reinstate benefits" is merely a lingering effect of the alleged violation. *See McGregor*, 3 F.3d at 867.

Further, Plaintiffs fail to establish that the doctrine of *contra non valentem* applies in this case. The doctrine of *contra non valentem* prevents the running of prescription in four situations. Because Plaintiffs allege that Defendants led them to believe that the changes to their benefits were only temporary, the Court assumes Plaintiffs rely on the third or fourth categories of *contra non valentem*. The third category prevents the running of prescription "where the [defendant] himself has done some act effectually to prevent the [plaintiff] from availing himself of his cause of action." *Marin v. Exxon Mobil Corp.*, 48 So. 3d 234, 245 (La. 2010). "This category is implicated only when (1) the defendant engages in conduct which rises to the level of concealment, misrepresentation, fraud or ill practice; (2) the defendant's actions effectually prevented the plaintiff from pursuing a cause of action; and (3) the plaintiff must have been reasonable in his or her inaction." *Id.* at 252 (citations omitted). Though Plaintiffs may have believed that the changes were only temporary, Plaintiffs fail to show that Defendants' conduct rose to the level of "concealment, misrepresentation, fraud or ill practice" or that Defendants'

actions prevented Plaintiffs from filing suit. Further, it was unreasonable for Plaintiffs to wait over six years before they filed suit, thinking that Defendants would restore their benefits.

The fourth category of *contra non valentem* suspends the running of prescription "where the cause of action is neither known nor reasonably knowable by the plaintiff even though plaintiff's ignorance is not induced by the defendant." *Id.* at 245. However, *contra non valentem* does not delay the commencement of prescription due to the plaintiff's misunderstanding of the probable extent or duration of the injuries. *Fontenot v. ABC Ins. Co.*, 674 So. 2d 960, 964 (La. 1996). Plaintiffs' argument that Defendants failed to inform them that the changes were permanent is not sufficient to delay the commencement of prescription. *See id.* ("Plaintiffs' contention that [the defendant's] failure to inform them that [the] condition was permanent versus temporary is of no consequence."). As the Louisiana Supreme Court has made clear, "the doctrine of *contra non valentem* only applies in 'exceptional circumstances.'" *Marin*, 48 So. 3d at 245. Here, Plaintiffs fail to demonstrate that "exceptional circumstances" warrant the tolling of prescription. Accordingly, Plaintiffs' Section 1983 claims are time-barred.

**D.   State Law Claims**

Plaintiffs ask the Court to retain supplemental jurisdiction over their state law claims in the event that this Court dismisses all of their federal claims. (Rec. Doc. 80, at 31.) Under 28 U.S.C. § 1367, district courts with original jurisdiction shall have supplemental jurisdiction over all claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy. 28 U.S.C. § 1367(a).

Section 1367(c)(3) provides that a district court "may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction." *Id.* § 1367(c)(3). District courts enjoy wide discretion in determining whether to retain supplemental jurisdiction over a state claim once all federal claims are dismissed. *Noble v. White*, 996 F.2d 797, 799 (5th Cir. 1993). "Ordinarily, when the federal claims are dismissed before trial, the pendent state claims should be dismissed as well." *Wong v. Stripling*, 881 F.2d 200, 204 (5th Cir. 1989). Accordingly, the Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims.

**<u>CONCLUSION</u>**

Accordingly,

39

**IT IS HEREBY ORDERED** that Defendants' *Motion for Summary Judgment* **(Rec. Doc. 73)** is **GRANTED**. Plaintiffs' federal law claims under ERISA and Section 1983 are **DISMISSED WITH PREJUDICE**. Plaintiffs' state law claims are **DISMISSED without prejudice**.

New Orleans, Louisiana this 23rd day of October, 2015.

CARL J. BARBIER
UNITED STATES DISTRICT JUDGE